IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIAM DUREN                                                                                    PLAINTIFF

v.                              Civil No. 4:10-cv-4123

G. TURNER, Warden of the
Miller County Correctional
Facility; W. NASH, Correctional
Officer; and SGT. MILLER                                                                         DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by Plaintiff, William Duren (hereinafter Duren) pursuant to 42 U.S.C. §1983. He proceeds *pro se* and *in forma pauperis.*

Duren maintains the Defendants violated his constitutional rights by failing to protect him from attack by fellow inmates. Separate Defendants Gary Turner and Alice Miller have filed a motion for summary judgment (Doc. 36). At Duren's request, a questionnaire (Doc. 40) was prepared to assist him in responding to the motion. Duren filed a response (Doc. 42) and the motion is now ready for decision.

**1. Background**

On December 23, 2008, Duren was arrested and placed in the Miller County Detention Center (MCDC). *Plaintiff's Response* (Doc. 42) at ¶ 1 (hereinafter *Plff's Resp.*). Duren maintains he was assaulted by an unknown black male on December 31st. *Id.* at ¶ 2(A). Duren believes the attack occurred because of his swastika tattoo. *Id.* Duren states he was taken to the hospital and treated for a broken nose, a cut left eye, and a swollen right eye. *Id.* On January 1, 2009, Duren states he spoke with Warden Turner (Turner) about the assault. *Id.* at 2(B). He was released on bond shortly after he

returned to the MCDC from the hospital. *Id.* at ¶¶ 2(B), 2(C) & 3.

On January 14, 2010, Duren was again booked into the MCDC. *Plff's Ex.* ¶ 4. In early February when Duren was moved to Max Delta from Max Charlie by Officer Derrick McLehiney (McLehiney), within twenty minutes, Duren maintains he was assaulted by two black males. *Id.* at ¶ 5(A). McLehiney and Sergeant Welch (Welch) responded to the assaults. *Id.* at ¶ 5(B). Duren indicates he received several scratches, bruises, and abrasions as a result. *Id.* He was treated with over-the-counter pain medication and antibiotic ointment. *Id.* at ¶ 5(C).

In early March, Duren maintains he was assaulted by two black males because of his tattoo. *Plff's Resp.* at ¶ 6(A). As a result of the assault, he received a busted lip, black eye, and several abrasions and bruises. *Id.* at ¶ 6(A). He was treated with over-the-counter pain medication and triple antibiotic ointment. *Id.* at ¶ 6(B).

According to Duren, he did not report this assault out of fear of retaliation. *Plff's Resp.* at ¶ 7(A). Duren indicates he informed staff that the injuries occurred on the basketball court. *Id.* He believed "the best way to avoid future assault out of retaliation would be not to inform jail staff." *Id.* He noted that no one had been punished for the assaults against him in the past. *Id.*

He did not tell staff about this attack until July 9th. *Plff's Resp.* at ¶ 7(B). During an interview with Captain Steve Hartline (Hartline), Duren explained that he had been assaulted several times and nothing was done in response. *Id.*

In May of 2010, the inmates in two pods were assigned to a single pod. *Plff's Resp.* at ¶ 8(A). According to Duren, this resulted in over-crowding and an attack against him by three black males. *Id.* at ¶ 8(B). Duren states he had to have four stitches on his left eye and had several bruises and abrasions. *Id.* Out of a fear of retaliation, Duren states he informed jail staff that he hit his eye on the bed. *Id.* Duren informed Hartline of the attack on July 9th during his internal investigation. *Id.* at ¶

8(C).

On July 6th, Duren asserts that Defendants Turner and Williams combined the inmates from two housing units. *Plff's Resp.* at ¶ 9. This caused forty-six inmates to be in a housing unit built for twenty-nine inmates. *Id.*

On July 8th, Duren alleges he told Nash and Williams that he was having problems with inmate Channing Pennington (Pennington) and that he needed to be separated from Pennington. *Plff's Resp.* at ¶ 10(A). Duren indicates Pennington had made threats against him. *Id.*

According to Duren, Nash and Williams told him to just keep his shirt on and he would be okay. *Plff's Resp.* at ¶ 10(B). That same day, Duren states he asked Nash, Williams, and Turner to move him to protective custody away from Pennington. *Id.* at ¶ 10(C). Duren states he was told to keep his shirt on and stay in his cell. *Id.*

Duren states that later the same day he was attacked by five black inmates including Pennington. *Plff's Resp.* at ¶ 11. Duren maintains the attack was racially motivated because his attackers had been asking about swastika and lighting bolt tattoo's on the white males who were attacked. *Id.* Following the incident, Duren and the other white inmates were placed in a holding cell. *Id.* at ¶ 13.

The incident report summary prepared by Hartline provides as follows:

> On Thursday evening, 07-08-2010, at approximately 10:10 PM an incident took place within Max C-pod involving approximately ten (10) inmates, possibly more. Four of the ten were identified as assault victims, with six suspected as aggressor inmates. Inmate Derrik HOLMES, B/M sustained a cut to the back of his head after being struck (possibly from behind) and apparently was knocked unconscious. Inmate Brandon GILBERT, W/M, sustained a busted upper facial lip after being hit with a box of dominoes, thrown by inmate Bobby WATSON, B/M. GILBERT was also slapped on the side of the head by WATSON and complained of pain to his inner left ear. Inmate William DUREN, W/M, was assaulted within his cell sustaining minor bumps and bruises. Inmate Charles BASHAM, W/M, claimed he and his cell-mate Brandon QUALLS, W/M, were assaulted within their cell by a group of Black inmates and were struck with fists and feet.

> Aggressor inmates were identified as: Bobby WATSON, B/M; Mark WILLIAMS, B/M; Channington PENNINGTON, B/M; Brent DAVIS, B/M; Mario PAXTON, B/M; and Tevin WALKER, B/M.

*Defendants' Exhibit* A at pg. 1. According to the report, Duren declined assessment or treatment by the medical staff. *Id.* at pg. 2. When he was strip searched by staff who responded to the incident, no signs of injury were noted. *Id.*

Hartline recommended that the inmates identified as aggressors by placed in the Super Max Unit and remain there pending the preparation of incident reports and referral for prosecution. *Defts' Ex.* A at pg. 4. Hartline also recommended a formal procedure be implemented for the separation of inmates identified as aggressors or victims. *Id.* He indicated this could be done utilizing remarks placed on the automated Crimestar system. *Id.* Prior to the approval of pod changes, the supervisory staff would be required to check Crimestar for remarks. *Id.*

Duren maintains he was did not refuse assessment and treatment by the medical staff. *Plff's Ex.* ¶ 14(A). Instead, he states he was never offered medical assessment or treatment. *Id.* When he was strip searched by Officer Pierce, Duren states Pierce should have observed abrasions and scratches on his face, back, and arms. *Id.* at ¶ 14(B).

When he was asked about the attack on July 8th, Duren maintains Turner told him that he should have stayed in his cell and kept his shirt on. *Plff's Resp.* at ¶ 15. Turner moved Duren to administrative segregation and he stayed there until his transfer to the Arkansas Department of Correction (ADC). *Id.* at ¶ 16. Duren talked to Hartline about the assault and advised him that he wanted to press charges against the inmates involved. *Id.* at ¶¶ 17-19.

After July 8th, Duren had no problems with Pennington or any other black inmates involved in the assault. *Plff's Resp.* at ¶ 20. However, he was separated from these inmates. *Id.* at ¶ 21.

Duren maintains the following contributed to making the MCDC unsafe: Defendants' failure to physically separate violent and non-violent offenders; Defendants' failure to physically separate pre-trial and post-trial offenders; Defendants' failure to make sure aggressors were prosecuted; the fact that individual cell doors could not close or lock allowing violent offenders to enter other cells freely; and Defendants' failure to have guards "in a area to provide adequate protection." *Plff's Resp.* at pg. 20.

### 2. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

### 3. Discussion

Defendants maintain they are entitled to judgment in their favor because they have not engaged in any type of conduct that has resulted in the violation of Duren's constitutional rights. The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. "A prisoner's conditions of confinement, including the safety measures taken to protect prisoners, are subject to scrutiny under the Eighth Amendment." *Davis v. Oregon County, Missouri*, 607 F.3d 543, 548 (8th Cir. 2010). Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998).

To prevail on his failure to protect claim, Duren must: first prove "he was incarcerated under

conditions posing a substantial risk of serious harm." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011). This is an objective requirement "to ensure the deprivation is a violation of a constitutional right." *Id.* "The second requirement is a subjective test; the defendant must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010)(internal quotation marks and citation omitted). "An official's negligence alone is insufficient to meet the subjective component because the official must recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis*, 607 F.3d at 549 (internal quotation marks and citation omitted).

With respect to the first four assaults, Defendants argue Duren has failed to give any back ground information as to what led up to the assaults. With respect to the final assault, they maintain that a verbal statement that an inmate was making threats, without anything more, is not a sufficient basis to find Defendants' to have been subjectively aware of any real or serious threat to Duren's safety. Additionally, Defendants argue there appears to be no causal connection between the non-specific threats mentioned by Duren and the actual incident. Defendants note that Pennington does not appear to have been the primary aggressor.

In making this latter argument, Defendants seek to narrow the focus of our inquiry further than required in a failure to protect claim. The danger need not be specific to Duren. In other words, if Defendants were aware of an obvious, substantial risk to inmate safety, this is a basis of liability. They need not know that the "complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Whitson v. Stone County Jail*, 602 F.3d 920, 924 (8th Cir. 2010).

Duren asserts he was assaulted on multiple occasions by Black males and that the assaults

were racially motivated. He indicates he told each of the Defendants he was going to be assaulted because of his swastika tattoo and was merely told to stay in his cell and keep his shirt on. Duren indicates the potential for violence increased with jail overcrowding, the failure to separate violent and non-violent inmates, the failure to separate pre-trial detainees and post-trial inmates, inadequate staffing, the location of existing staff, the fact that the individual cells could not be locked, and the failure to prosecute inmates who assaulted other inmates. When these factors are considered along with the history of assaults on Duren, I believe there is a genuine issue of fact as to whether Duren was incarcerated under conditions posing a substantial risk of serious harm and whether Defendants were deliberately indifferent to that risk.

Defendants final argument is that Duren's injuries do not support a failure to protect claim. "Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*. . . . No clear line divides *de minimis* injuries from others" *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008). In the context of excessive force cases, the Supreme Court has ruled that *de minimis* injuries do not foreclose a claim under the Eighth Amendment. *Wilkins v. Gaddy*, ___ U.S. ___, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010). During the first attack, Duren states he suffered a broken nose, a cut left eye, and a swollen left eye and was taken to the hospital for treatment. *Plff's Resp.* at ¶ 2(B). During the second attack, Duren received several scratches, bruises and abrasions. *Id.* at ¶ 5(A). During the third attack, Duren received a busted lip, black eye, and several abrasions and bruises. *Id.* at 6(A). During the fourth attack, Duren suffered a cut on his left eye that required stitches and several bruises and abrasions. *Id.* at ¶ 8(B). During the final attack, Duren states he was hit on the side of the head and after he fell to the floor he was punched and kicked sustaining

abrasions and scratches to his face, neck, back, and arms.  *Defts' Ex.* A; *Plff's Resp.* at ¶ 14(B).  I do not believe the nature of Duren's injuries foreclose his failure to protect claim.

### 4.  Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 36) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of February 2012.

/s/ *J. Marschewski*
 HON. JAMES R. MARSCHEWSKI
 CHIEF UNITED STATES MAGISTRATE JUDGE